# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

LORCEN BURROUGHS,

Plaintiff,

v.                                                         9:15-CV-818
                                                           (DNH/ATB)
DERRICK PETRONE, ET AL.,

Defendants.

LORCEN BURROUGHS, Plaintiff, pro se
MARK G. MITCHELL, Asst. Attorney General, for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge.  In this civil rights action, plaintiff alleges that his constitutional rights were violated while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS") at the Coxsackie Correctional Facility ("Coxsackie"). (Amended Compl. ("Am Compl."), Dkt. No. 12).

Specifically, plaintiff alleges that defendant McKeown used excessive force when he handcuffed plaintiff during a cell escort on April 1, 2013. (Am. Compl. ¶¶ 163-65).  As set forth in the Amended Complaint, defendant McKeown violently grabbed the handcuffs to pull plaintiff's arms over his head, in defiance of physician's orders, and then "maliciously and sadistically" pushed plaintiff in the back. (Dkt. No. 148-5 ¶ 20).  These actions caused plaintiff's "shoulder to snap." (*Id*.)  Plaintiff also

alleges that defendant McKeown conducted a strip frisk prior to plaintiff's transfer from Coxsackie on April 13, 2013. (Am. Compl. ¶ 171).  He alleges that defendant McKeown used this opportunity to "grab[] plaintiff by the hair from behind and maliciously and sadistically bang plaintiff's face against the concrete wall." (Dkt. No. 148-5 ¶ 28).  Defendants Melendez and Callens were present in the strip frisk room and failed to intervene to protect plaintiff. (Am. Compl. ¶ 169).

In addition to the Eighth Amendment claims, plaintiff alleges that numerous defendants were part of an alliance among Coxsackie correctional officers who singled plaintiff out for retaliation because he had filed grievances against some of them. (Am. Compl. ¶ 204-205).  This retaliation allegedly began after plaintiff filed a grievance against defendant Petrone, who then persuaded other correctional officers to file false misbehavior reports accusing plaintiff of various offenses including disruptive behavior, refusal to follow orders, holding excess property, and attempting to smuggle state property out of the facility by mail. (Dkt No. 148-3 ¶ 5-7; Dkt. No. 148-6 ¶ 4-5).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 132).  Plaintiff responded in opposition to the motion, and defendants filed a reply. (Dkt. Nos. 148, 149).  Plaintiff also filed a surreply. (Dkt. No. 150).  For the reasons set forth below, this court will recommend granting defendants' summary judgment motion, and dismissing plaintiff's Amended Complaint in its entirety.

## I. <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material

fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general.  *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL

1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).   Even where a complaint or affidavit

contains specific assertions, the allegations "may still be deemed conclusory if [they

are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with

inconsistencies and improbabilities that no reasonable juror would undertake the

suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.,*

2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549,

554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh

the credibility of the parties at the summary judgment stage, in the rare circumstance

where the plaintiff relies almost exclusively on his own testimony, much of which is

contradictory and incomplete, it will be impossible for a district court to determine

whether 'the jury could reasonably find for the plaintiff,' . . .  and thus whether there are

any "genuine" issues of material fact, without making some assessment of the

plaintiff's account.")).

## II.     **Exhaustion of Administrative Remedies**

### A.     **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an

inmate to exhaust all available administrative remedies prior to bringing a federal civil

rights action.  The exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and regardless of the

subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004)

(citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Inmates must exhaust their

administrative remedies even if they are seeking only money damages that are not

available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a

5

grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 136 S. Ct. at 1857. "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 Fed. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321 at *2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or
> consistently unwilling to provide any relief to aggrieved

6

> inmates; (2) it is "so opaque that is [sic] becomes, practically
> speaking, incapable of use"; or (3) "prison administrators
> thwart inmates from taking advantage of a grievance process
> through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a corrections officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

7

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id*. at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id*. (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id*. The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed . . . [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id*. Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id*. at 126.[1] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

## B.    Analysis

Defendants contend that plaintiff failed to exhaust his administrative remedies regarding the April 1, 2013 handcuffing incident because he did not complete the three step grievance process. They also contend that plaintiff failed to exhaust his administrative remedies relating to the strip frisk on April 13, 2014, because there is no record that he filed a grievance at all. Defendants have not raised the exhaustion issue with respect to plaintiff's retaliation claims.

---

[1] My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

In *Ferrer v. Racette*, Chief District Judge Glenn T. Suddaby explained, in the context of a summary judgment motion, who bears the burden of proof and production on certain aspects of the issue of exhaustion:

> "Because failure to exhaust is an affirmative defense, . . . defendants bear the initial burden of establishing, by pointing to 'legally sufficient sources' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." . . . "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability."

*Ferrer v. Racette*, No. 9:14-CV-1370 (GTS/DJS), 2017 WL 6459525, at *12 (N.D.N.Y. Dec. 18, 2017) (citing, inter alia, *Hubbs v. Suffolk Cnty. Sheriff's Dept.*, 788 F.3d 54, 59 (2d Cir. 2015) ("If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors . . . rendered a nominally available procedure unavailable as a matter of fact.")[2]  *Accord*, *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 554-55 (W.D.N.Y. 2018) (pending appeal).

Defendants have established, and plaintiff agrees, that a grievance process existed at Coxsackie and other DOCCS facilities during the relevant time period, and that plaintiff was aware of such process and had used it to pursue previous complaints

---

[2] I agree with Magistrate Judge Peebles' cogent analysis that, while the burden of production may shift to a plaintiff with respect to certain aspects of the exhaustion issue, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g., Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012) (Rep't-Rec.), *adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015) (Rep't-Rec.), *adopted*, 2013 WL 1305338 (N.D.N.Y.  Mar. 18, 2013).

related to his confinement. (Dkt. No. 132-40, "Seguin Decl." ¶¶ 1-2; Dkt. No. 132-2, Ex. 1 to Mitchell Decl., Deposition Transcript ("Depo.") at 32-33). Therefore, the exhaustion inquiry on plaintiff's Eighth Amendment causes of action will center on whether plaintiff can demonstrate that those established grievance procedures were, for practical purposes, unavailable to him.

### 1.    Handcuffing Incident on April 1, 2013

The record includes a copy of Grievance No. CX-17682-13, filed at Coxsackie on April 3, 2013. (Dkt. No. 132-11). In that grievance, plaintiff complained about the manner in which defendant McKeown applied handcuffs on April 1, 2013. (*Id*. at 3). The Coxsackie superintendent denied this grievance on April 18, 2013. (*Id*. at 1). The bottom section of this determination, labeled "Appeal Statement" is intended to allow an inmate to appeal the determination to CORC. (*Id*.) On the version provided by defendants, this section is blank.

Defendants have also provided the declaration of Rachel Seguin, a non-party who is the Assistant Director of the Inmate Grievance Program for DOCCS, and serves as the custodian of the records maintained by CORC. (Seguin Decl. ¶ 1). Ms. Seguin searched CORC records and found no grievance appeal to CORC related to the use of excessive force at Coxsackie in April 2013. (*Id*. ¶ 2). Ms. Seguin also submitted a printout of all CORC appeals filed by plaintiff. (Dkt. No. 132-41). None of the listed appeals reference the handcuffing incident in April 2013. (*Id*.)

Plaintiff has offered a variety of explanations for the lack of appeal documentation in CORC files. At his August 1, 2016 deposition, plaintiff testified that

he did not recall whether he had received the April 18, 2013 notice of the Superintendent's denial or filed an appeal. (Depo. at 186-87). He assumed that he never received the Superintendent's denial, because "had I . . . received it, I would have appealed this." (*Id*. at 186).

Plaintiff's response to this summary judgment motion offers an alternate explanation for the lack of an appeal to CORC, with much more detail than he was able to offer at his deposition. (Dkt. No. 148-4). Plaintiff states that he received the Superintendent's denial of Grievance CX-17682-13 after his transfer to Orleans Correctional Facility ("Orleans"). (*Id*. ¶ 4). Upon receipt, he "immediately submitted an appeal to (CORC) by placing my appeal in a sealed envelope address[ed] to the grievance clerk at Coxsackie Correctional Facility and provided same to Correction Officer during mail pick up in S.H.U." (*Id*.) In support of this assertion, plaintiff submitted a copy of the Superintendent's April 18, 2013 denial. (Dkt. No. 148-4, at 5). Unlike the copy provided by defendants, this version includes a completed "Appeal Statement" signed by plaintiff and dated April 28, 2013. (*Id*.) There is no indication that the document was received by the grievance clerk. (*Id*.)

Relying on this document and the line of cases following *Williams*, plaintiff contends that grievance procedures were unavailable to him, as a practical matter. A plaintiff's unverifiable contention that his grievance or appeal must have been lost or destroyed is generally not enough to defeat a motion for summary judgment. *See, e.g.*, *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (Rep't-Rec.), *adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)

("Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.") (collecting cases); *Chambers v. Johnpierre*, No. 3:14-CV-1802, 2016 WL 5745083, at *6-7 (D. Conn. Sept. 30, 2016) (plaintiff's unsupported statements that he filed grievances and grievance appeals before his transfer to another facility "do not create an issue of fact with regard to the exhaustion of his claims").  Here, plaintiff has provided documentary evidence that he attempted to file a grievance, although it is documentary evidence that he apparently had no recollection of during his deposition.  This newly discovered letter is one of several factors, including plaintiff's necessary reliance on SHU officers to deliver his grievance and his recent transfer from Coxsackie, that a fact-finder may consider when evaluating the question of exhaustion.  *See Medina v. Napoli*, 725 F. App'x 51, 52 (2d Cir. 2018) ("Medina, like [the plaintiff in *Williams*] was an inmate in a special housing unit who was required to rely on correction officers to file his grievances, and both Medina and Williams alleged that those officers intentionally discarded the grievances or prevented them from being filed").  In light of these factors, the exhaustion determination hinges on the question of plaintiff's credibility.  Therefore, this court finds that summary judgment is not warranted on the issue of exhaustion, with regard to plaintiff's excessive force claim related to the handcuffing incident on April 1, 2013.  In reaching that recommendation, this court makes no finding on the ultimate question of whether administrative remedies were actually available to plaintiff, within the meaning of *Williams*.

### 2.      April 14, 2013 Strip Frisk

The same analysis applies to plaintiff's Eighth Amendment claims arising from the April 14, 2013 strip frisk.  The record contains no documentation of any grievance filed in connection with the incident, during which plaintiff alleges defendant McKeown used excessive force and defendants Melendez and Callens failed to intervene.  Defendants again rely on the declaration of Ms. Seguin, who searched the CORC records and found none that related to plaintiff's excessive force or other claims arising from the strip frisk incident.[3] (Seguin Decl. ¶ 2).

At his deposition, plaintiff testified that he filed a grievance regarding the strip frisk "as soon as I got to Orleans, within the next few days I was filing grievances." (Depo. at 225).  He did not recall any other details about these grievances, or whether he had appealed an adverse decision. (*Id*. at 225-26).  He testified that "I'm quite sure that if you don't have any record of it, that they, once again, covered up and didn't file it and send it." (*Id*. at 226).

In his response to this motion, plaintiff provided greater detail.  He specified that he mailed his grievance complaint "[o]n April 15, 2013 and April 16, 2013" to the grievance clerk at Coxsackie, the grievance clerk at Orleans, and the Orleans superintendent, "by providing same in a sealed envelope to Correction Officer during mail pick-up in (S.H.U.) at Orleans Correctional Facility." (Dkt. No. 148-4 ¶ 5).  He asserts that he received no response to the grievances, and that he sent a letter to the

---

[3] Defendants did not file any documentation from Coxsackie or Orleans regarding any initial grievances filed by plaintiff at those facilities to support their contention that plaintiff never filed any grievance related to the strip frisk incident.

DOCCS Commissioner on May 18, 2013 expressing his concerns that his grievances were being ignored or destroyed. (*Id*. ¶ 7). There is no record indicating whether the DOCCS Commissioner received plaintiff's letter. (*Id*.)

Plaintiff also asserts that four correctional officers at Orleans, who are not defendants in this proceeding, threatened to plant a weapon in his cell if he did not stop filing grievances. (*Id*. ¶ 8). Plaintiff does not provide the dates of these alleged threats, or suggest why these officers would have been motivated by grievances filed against officers at a different facility. (*Id*.)

Again, this court does not conclude, on the summary judgment record, that administrative remedies were unavailable to plaintiff, under the *Williams* rationale. However, plaintiff has raised sufficient questions of fact to withstand defendants' motion for summary judgment on exhaustion grounds, by alleging that DOCCS officials interfered with his ability to file grievances shortly after his transfer to Orleans SHU. I will now proceed to evaluate defendants' alternate grounds for summary judgment with regard to plaintiff's Eighth Amendment causes of action, that plaintiff failed to state a claim.

## III.    **Excessive Force**

### A.    **Legal Standard**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth

Amendment claim.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "'inconsistent with the contemporary standards of decency.'"  *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9.  The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries.  *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10 (citations omitted).  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'"  *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness."  *Id*. at 21 (citation omitted).  The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Id*. (quoting *Hudson*, 503 U.S. at 7).  In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the

defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### B.    Application

#### 1.    April 1, 2013 Handcuffing Incident (McKeown)

Defendant McKeown declared to the court that he went to plaintiff's cell on April 1, 2013 to transport him to a meeting with a counselor. (Dkt. No. 132-30, "McKeown Decl." ¶ 10).  He asserts that he applied mechanical restraints, including handcuffs, to plaintiff "in accordance with standard procedure for such a meeting." (*Id*.).  As described by defendant McKeown,

> [p]ursuant to that procedure, the inmate is directed to place his hands forward through the feedup port of his cell to be handcuffed in the front. The inmate then turns to face the back of his cell and puts his hands behind his head with the handcuffs on.  After the cell door is opened and the inmate backs out of the cell, one officer holds the handcuffs . . .while another officer secures a waist chain around the inmate's waist.  Then the inmate lowers his hands in front to his waist and the handcuffs are secured to the waist chain with a padlock.

(*Id*.)

In his response to this motion for summary judgment, plaintiff agrees that "[o]n April 1, 2013 Coxsackie Correctional Facility (S.H.U.) had a handcuffing policy which requires the prisoner to: (1) place his hands through the feed up port of his cell to be handcuffed in the front; (2) the inmate must then turn to face the back of his cell and put his hands behind his head with the handcuffs on."  (Dkt. No. 148-5 ¶ 14).  Despite recognizing that this was the policy, plaintiff contends that he should have been handcuffed with his hands behind his back, which would have allegedly been easier on

16

his shoulder. (Dkt. No. 132-2, at 159).  He provides no support for this opinion.

Defendant McKeown noted that handcuffing plaintiff behind his back would have been

inappropriate for his meeting with a counselor.  (McKeown Decl. ¶ 12).  As described

by defendant McKeown, "[t]he inmate is handcuffed in the front so that the inmate can

sit comfortably at a desk for his meeting with the counselor, sign things, and handle

documents." (*Id*. ¶ 13).

Plaintiff also contends that defendant McKeown should have been aware that he

could not lift his hands above his head, because Dr. Jon Miller, a physician at

Coxsackie, had entered a note in plaintiff's file on March 29, 2013 that addressed

plaintiff's shoulder impairment. (Dkt. No. 148-5 ¶ 16).  However, plaintiff has only

speculated that defendant McKeown was aware of this note, which was dated just three

days prior to the handcuffing incident.  Moreover, Dr. Miller's note would not

necessarily have discouraged defendant McKeown, or any correctional officer, from

applying the handcuffs in accordance with typical facility policy.  Dr. Miller wrote that

plaintiff "has range of motion restrictions affecting the right shoulder.  He cannot move

this shoulder to the extreme of range.  This should not affect normal cuffing." (Dkt. No.

132-11, at 9).  In light of the handcuffing policy used at Coxsackie, a reasonable

correctional officer could conclude that "normal cuffing" meant cuffing from the front,

and requiring plaintiff to raise his hands over his head.

Plaintiff also alleges that defendant McKeown grabbed the handcuffs and

"violently" pulled plaintiff's arms behind his head, "causing severe pain and plaintiff's

shoulder to snap." (Dkt. No. 148-5 ¶ 20).  He then alleges that defendant McKeown

"began to maliciously and sadistically push the top part of plaintiff's back, causing more pressure on plaintiff's shoulders and severe pain." (*Id.*)  Defendant McKeown denies these allegations. (McKeown Decl. ¶ 13).

Despite the alleged violent nature of defendant McKeown's actions, plaintiff does not allege that he required any medical attention following the incident.  At his deposition, plaintiff could not recall taking any pain medication or other treatment, and he did not recall whether the incident resulted in any permanent damage to his shoulder. (Depo. at 183).  When asked to describe the intensity of his shoulder pain after the incident, plaintiff testified that "I don't recall how intense it was, but I was sore." (*Id.*) Although the lack of injury is not fatal to an excessive force claim, the extent and nature of an injury, if any, "'. . . is probative of the amount and type of force actually used  . . .  and that in turn is likely to reflect on the reasonableness of that force[.]'" *Cunningham v. McCluskey*, No. 05 Civ. 10169, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (quoting *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009); *Washington v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008) (finding de minimus injury to be probative of de minimus force)) (Rep.-Rec.), *adopted*, 2011 WL 3478312 (S.D.N.Y. Aug. 8, 2011).

Therefore, as alleged, defendant McKeown handcuffed plaintiff in a manner consistent with accepted facility practices, and any conclusion that he knew or should have known about the physical limitations of plaintiff's right shoulder would be purely speculative.  Moreover, plaintiff has only alleged de minimus injuries, if any, that resulted from either the method in which he was handcuffed or defendant McKeown's

actions while he was escorting plaintiff from his cell.  Accordingly, this court recommends that defendant McKeown be granted summary judgment on the excessive force claim arising from the April 1, 2013 handcuffing incident.

### 2.    April 13, 2013 Strip Frisk (McKeown, Melendez, Callens)

In his Amended Complaint, plaintiff alleged that defendant McKeown "grabbed plaintiff by hair from behind and banged plaintiff's face against the concrete wall" during the April 13, 2013 strip frisk. (Am. Compl. ¶ 171).  At his deposition, plaintiff testified that,

> I just remember him grabbing me.  I had my hair in singles at the time . . . so they were individually braided, so they were loose.  I just remember him coming from behind, and, you know, grabbing my hair and banging my head against the wall . . . . I remember him just grabbing me from behind, you know, intertwining his hands in my hair and banging my face against the wall.

(Depo. at 194-95).

Plaintiff did not recall how many times his face was banged against the wall. (Dkt. No. 132-2, at 198).  He further alleges that defendants Melendez and Callens were present during this attack, and failed to intervene and protect plaintiff. (Depo. at 201-204).

Defendant McKeown denied plaintiff's allegations that he grabbed plaintiff's hair or banged his face against the wall.  (McKeown Decl. ¶ 14).  He stated that plaintiff "suddenly moved toward me in an aggressive manner" during the strip frisk. (*Id.*)  In response, defendant McKeown "used my hands to guide him back to the wall. I held him there briefly until other officers assisted me and I determined that the situation was under control.  I then completed the strip frisk." (*Id.*)  Defendants

Melendez and Callens provided declarations that supported defendant McKeown's version of events. (Dkt. Nos. 132-36, 132-42).

Defendants also submitted a surveillance video of the incident that supports their summary judgment motion.[4]  (Dkt. No. 134, "Video").  The time-stamped video is approximately fourteen minutes long, without audio, and comes from a camera located in the strip frisk room.[5]  It begins with three correctional officers waiting for plaintiff to be escorted to the room.  Based on the record, the three officers were defendants McKeown, Melendez, and Callens. (Depo. at 192-93).  A fourth correctional officer escorted plaintiff into the room. (Video at 13:32:40).  Plaintiff was immediately positioned in the corner of the room, facing the wall.  Once plaintiff was in the corner, the camera angle limited the view of plaintiff to occasional portions of his head and upper body.  However, defendant McKeown was visible on camera for the entirety of the video.

As shown in the video, defendant McKeown walked over to plaintiff and used a set of keys to remove plaintiff's shackles. (*Id*. at 13:33:07).  He then appeared to issue a

---

[4] The court may rely on the video of the relevant events in concluding that no reasonable fact finder could credit the plaintiff's inconsistent claims about the incident.  *See, e.g.*, *Kalfus v. New York and Presbyterian Hosp.*, 476 F. App'x 877, 880‑81 (2d Cir. 2012) (the video demonstrated that plaintiff resisted arrest by refusing to stand up or be handcuffed, and that the patrolmen used only reasonable force to overcome his resistance; no reasonable fact finder could conclude that defendants applied excessive force); *Green v. Morse*, 00 CV 6533, 2009 WL 1401642, at *27 (W.D.N.Y. May 18, 2009) (this court may rely on the video evidence clearly showing that some use of force was necessary to grant summary judgment and dismiss plaintiff's excessive force claim) (citations omitted).

[5] The video is File No. ch08_20130412133059 on the DVD provided by defendants.  A second camera was located in the strip frisk room, and the video from this camera (File No. ch09_20130412133414) was also provided by defendants.  This second video does not show any relevant portions of the strip frisk or alleged excessive force because the camera was blocked by the room's privacy curtain.

series of verbal commands to plaintiff, and pulled a privacy curtain across the middle of the room. (*Id*. at 13:33:25). Defendants Melendez and Callens remained on the other side of the curtain, and could not observe the strip frisk. Defendant McKeown then began the strip frisk. (*Id*. at 13:33:28).

Plaintiff first handed defendant McKeown his head covering and shirt. (*Id*. at 13:33:59). As he removed this clothing, plaintiff backed away from the wall slightly, and became more visible on the video. (*Id*. at 13:33:53). When plaintiff began to back toward him, defendant McKeown applied his left hand to plaintiff's arm or shoulder and pushed him back against the wall. (*Id*. at 13:33:54).

The strip frisk continued, with plaintiff handing defendant McKeown his undershirt and shoes. (*Id*. at 13:34:32). When plaintiff was removing his pants, he again took one or more steps backward from the wall, toward defendant McKeown. (*Id*. at 13:34:41). In response, defendant McKeown applied two hands to plaintiff's upper back and pushed him forward against the wall. (*Id*. at 13:34:42). Defendant McKeown then removed his right hand from plaintiff, and continued to hold plaintiff against the wall with his left hand. (*Id*. at 13:34:44). Defendant Melendez and Callens pulled open the privacy curtain, but did not make any contact with plaintiff. (*Id*. at 13:34:55). During this time, defendant McKeown's right hand is visible on camera, and it did not make further contact with plaintiff.

Defendant McKeown spoke to plaintiff, removed his left hand from plaintiff, and stepped away from plaintiff. (*Id*. at 13:35:00). Defendants Melendez and Callens then pulled the privacy curtain closed and returned to their original positions. (*Id*. at

13:35:20).  The strip frisk continued, with plaintiff handing defendant McKeown his pants and socks. (*Id*. at 13:35:35).  Plaintiff's full head and upper body is visible on camera as plaintiff faced defendant McKeown and ran his fingers through his own hair. (*Id*. at 13:35:43).  Defendant McKeown inspected plaintiff's mouth, and then plaintiff handed him his underwear. (*Id*. at 13:36:14).  Defendant McKeown then completed the strip frisk and tossed plaintiff's clothes to him. (*Id*. at 13:36:33).

When plaintiff was partially dressed, defendant McKeown opened the privacy curtain. (*Id*. at 13:37:09).  Defendants Melendez, Callens, and another correctional officer were in the room. (*Id*. at 13:37:25).  A fifth correctional officer arrived at the door and delivered plaintiff's boots and either a jacket or button-down shirt. (*Id*. at 13:37:45).  Defendant Melendez then left the room. (*Id*. at 13:37:48).  When plaintiff was fully dressed, defendant Callens placed him in wrist shackles. (*Id*. at 13:39:24).

Another inmate was then escorted into the room and placed into a chair. (*Id*. at 13:41:56).  Plaintiff was placed in the chair next to him. (*Id*. at 13:41:59).  Defendant Callens then applied leg shackles to both inmates, and escorted them from the room. (*Id*. at 13:43:10).  Defendant McKeown left the room just before the inmates were escorted out.

Based on the video evidence, no reasonable finder of fact would credit plaintiff's claim that defendant McKeown grabbed him by the hair with both hands and violently banged his head into the wall.  While defendant McKeown applied force during the strip frisk, that force was limited to a brief one-handed shove to plaintiff's left arm or shoulder, and then a later two-handed shove to plaintiff's back, followed by

22

an approximately thirty second interval during which defendant McKeown held plaintiff against the wall with one hand.

De minimus force, such as that shown in the video of plaintiff's strip frisk, does not satisfy the objective element of an Eighth Amendment claim.  Nor do the de minimus injuries (bruising, headache, blurred vision) that plaintiff alleged that he experienced after the incident.[6] (Depo. at 206).  In similar cases, the courts have granted summary judgment in favor of defendants.  *See, e.g.*, *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (holding that inmate's claims that he was "bumped, grabbed, elbowed, and pushed" by prison officials insufficient to state Eighth Amendment claim); *Bermudez v. Waugh*, No. 09:11-CV-947 (MAD/DEP), 2013 WL 654401 at *5 (finding that tackling of inmate that caused minor bruising constituted de minimus force); *James v. Phillips*, No. 05 Civ. 1539, 2008 WL 1700125 at *4 -*5 (S.D.N.Y. 2008) (finding de minimus use of force when prison guard shoved inmate into cell door, causing swelling of the inmate's chin); *see also Robinson v. Henschel*, No. 10 Civ. 6212, 2014 WL 1257287, at *7 (S.D.N.Y. Mar. 26, 2014) (plaintiff's hand was slammed repeatedly against the wall) (citing *Taylor v. N.Y. Dep't of Corr.*, No. 10 Civ. 3819, 2012 WL 2469856, at *5 (S.D.N.Y. June 27, 2012) (corrections officer forced inmate's face into the wall).

In cases where the defendants applied "only a degree of roughness that is common in prison contexts," and plaintiff has "not claimed a lasting or even fleeting injury resulting from the defendant's conduct, courts in this circuit have routinely held

---

[6]At his deposition, plaintiff testified that he did not recall how long any of these impairments lasted, but that he was no longer experiencing them. (Dkt. No. 132-2, at 206).

that such conduct is insufficiently serious to support an Eighth Amendment claim."
*Robinson*, *supra* (quoting *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 507
(S.D.N.Y.2012)).  Consistent with that approach, I recommend summary judgment for
defendant McKeown with regard to plaintiff's excessive force claim arising from the
April 13, 2013 strip frisk.  I also recommend summary judgment for defendants
Melendez and Callens, for an alleged failure to intervene and protect plaintiff from
excessive force during the strip frisk.[7]

## IV.    **Retaliation (Petrone, Stetz, Mellett, Baldwin, Morris, McKeown)**

### A.    **Applicable Law**

In order to establish a claim of retaliation for the exercise of a First Amendment
right, plaintiff must show that he engaged in constitutionally protected speech or
conduct, and that the protected activity was a substantial motivating factor for "adverse
action" taken against him by defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir.
2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v.
Coughlin*, 114 F.3d 390 (2d Cir. 1997).  The Second Circuit has defined "adverse
action" in the prison context as "retaliatory conduct 'that would deter a similarly

---

[7] A correctional officer has an affirmative duty to intervene on behalf of an individual
whose constitutional rights are being violated by other officers in his or her presence.  *Cicio v.
Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010). In
order to establish liability under this theory, a plaintiff must prove that the defendant in question
(1) possessed actual knowledge of the use by another correction officer of excessive force; (2)
had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless
disregarded that risk by intentionally refusing or failing to take reasonable measures to end the
use of excessive force. *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010);
*Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).  Because no reasonable
finder of fact could conclude that defendant McKeown used excessive force, there can be no
cognizable claim for failure to intervene on the part of defendants Melendez and Callens.

24

situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.* Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases).

To establish retaliation, the plaintiff must also demonstrate a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). Although a "'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp. 2d at 370 (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id*. at 371. "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison

administration."  Accordingly, plaintiff must set forth non-conclusory allegations to

sustain a retaliation claim.  *Bennett*, 343 F.3d at 137.  Even where a complaint or

affidavit contains specific assertions, the allegations "may still be deemed conclusory if

[they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete

with inconsistencies and improbabilities that no reasonable juror would undertake the

suspension of disbelief necessary to credit the allegations made in the complaint.'"

*Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.11

(N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55

(2d Cir. 2005)).  To be sufficient to create a "factual issue," in the context of a summary

judgment motion, an allegation in an affidavit or verified complaint "must, among other

things, be based 'on personal knowledge.'"  *Id.,* 2006 WL 1133247, at *3 & n.7

(collecting cases); Fed. R. Civ. P. 56(c)(4).

### B.    Application

Plaintiff raises a number of retaliation claims against six different defendants.

First, he claims that defendant Petrone filed a false misbehavior report against plaintiff

on July 7, 2013, because plaintiff filed a grievance against him.  (Depo. at 37-38).  The

record shows that the grievance in question was not marked "filed" until July 9, 2013,

two days after the allegedly false misbehavior report.  Plaintiff attempts to explain away

this inconsistency by asserting that defendant Petrone observed him writing the

grievance in his cell on July 4, 2013, and decided to retaliate. (Depo. at 38).  The

reliability of this argument is called into question, however, by plaintiff's alternate

theories that defendant Petrone was actually motivated by plaintiff's refusal of his

sexual advances, or by hostility toward plaintiff's race or religion. (Depo. at 38, 49-50, 56).

Plaintiff also alleges that defendant Petrone encouraged other correctional officers to retaliate against plaintiff, and that these correctional officers openly discussed their retaliatory motives in front of plaintiff, often at the same time that they were issuing him false misbehavior reports. (Depo. at 59-60, 66-67, 81, 94, 102, 104, 107, 122-24, 135-36, 143, 155, 207, 228).  For example, plaintiff alleged that as a result of this conspiracy, defendants Stetz, Baldwin, Melett, and Morris conspired to frame plaintiff for having excessive property in his cell, and then falsely accused plaintiff of attempting to smuggle state property when he tried to mail this excess property home.[8] (Dkt. No. 59-60, 143).  In addition, plaintiff alleged that defendant McKeown wrote his first of multiple misbehavior reports against plaintiff only after defendant Baldwin told him about plaintiff's grievance history. (Depo. at 154, 228).  Defendant McKeown then continued this cycle of retaliation by encouraging other correctional officers to act adversely to plaintiff. (Depo. at 247).

Without more, courts have regularly dismissed claims that a defendant has retaliated for complaints against a third party.  *See*, *e.g.*, *Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about

---

[8] This allegation ignores the fact that defendant Baldwin ruled in plaintiff's favor at the disciplinary hearing arising from the excess property charge. (Depo. at 117, 140-44).

an incident involving another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp.

2d at 369 (plaintiff has failed to provide any basis to believe that a corrections

counselor would retaliate for a grievance that she was not personally named in).

All of plaintiff's retaliation claims are based upon his own conclusory allegations, some

of which are inconsistent with the objective factual record. For example, plaintiff

admitted in his deposition that some of the allegedly false charges against him, such as

the presence of state property in his bags, were accurate. (Depo. at 113-116). *See, e.g.,*

*Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994) (holding that the defendants met

their burden to show they would have filed disciplinary charges absent any retaliatory

motive when "it was undisputed that [plaintiff] had in fact committed the prohibited

conduct").

Moreover, the only evidence that plaintiff offers to support his broad retaliation

theory are alleged self-incriminating statements by various correctional officers that

defendant Petrone or McKeown had instructed them to act against plaintiff. (Depo. at

59-60, 66-67, 247). All of the defendants have provided sworn declarations denying

any retaliatory motive. Plaintiff's poorly supported allegations of retaliation,

particularly in light of the use of force video that contradicts plaintiff's Eighth

Amendment claims and plaintiff's lengthy disciplinary history that predates the alleged

retaliatory behavior, are insufficient for any reasonable jury to "undertake the

suspension of disbelief necessary to credit the allegations made in the complaint."

*Jeffreys*, 426 F.3d at 554-55; *see also Brooks v. Rock,* No. 9:11-CV-1171 (GLS/ATB),

2014 WL 1292232, at *22 (N.D.N.Y. Mar. 28, 2014) (no reasonable fact finder could

conclude that defendant retaliated against plaintiff, where plaintiff's only support was his unverifiable and improbable claim that defendant admitted his retaliatory motive to plaintiff); *Allah v. Greiner*, No. 03 Civ. 3789, 2006 WL 357824, at *1, 3, 5-6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (inmate's allegations that virtually all of the defendants made specific admissions that they retaliated against him were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create an issue of fact).

Therefore, this court recommends that summary judgment be granted as to the retaliation claims against defendants Petrone, Stetz, Mellett, Baldwin, Morris, and McKeown.[9]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 132) be **GRANTED**, and that plaintiff's Amended Complaint (Dkt. No. 12) be **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d

---

[9] Defense counsel also argued that all defendants were entitled to summary judgment on qualified immunity grounds. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because this court has found that the defendants have not violated the plaintiff's rights in the first instance, it need not reach the issue of whether a reasonable person would have known of the violation.

Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:       December 27, 2018

Hon. Andrew T. Baxter
U.S. Magistrate Judge